UNITED STATES, Appellee

v.

Stephen P. CHATFIELD, Lieutenant Junior Grade
U.S. Navy, Appellant

No. 08-0615

Crim. App. No. 200602256

United States Court of Appeals for the Armed Forces

Argued February 5, 2009

Decided June 26, 2009

RYAN, J., delivered the opinion of the Court, in which EFFRON,
C.J., and BAKER, ERDMANN, and STUCKY, JJ., joined.

Counsel

For Appellant:  Lieutenant Kathleen L. Kadlec, JAGC, USN
(argued).

For Appellee:  Captain Geoffrey S. Shows, USMC (argued); Brian
K. Keller, Esq., and Major Tai D. Le, USMC.

Amicus Curiae for Appellant:  Natasha Nisttahuz (law student)
(argued); Daniel H. Benson, Esq. (supervising attorney), Clayton
Hightower (law student), Scott Luu (law student), Eric R. Pace
(law student) (on brief); Charles Pelowski (law student) -- of
the Texas Tech School of Law.

Amicus Curiae for Appellee:  Jonathon C. Clark (law student)
(argued); Richard D. Rosen, Esq. (supervising attorney), James
V. Leito IV (law student); Jared M. Miller (law student), James
J. Mustin (law student), Courtney G. Stamper (law student) (on
brief) -- of the Texas Tech University School of Law.

Military Judge:  Daniel E. O'Toole

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Chatfield, No. 08-0615/NA

Judge RYAN delivered the opinion of the Court.

I.  Introduction

This case presents the questions whether the military judge properly admitted statements Appellant gave to a civilian police officer after being brought to the police station by his executive officer (XO), and whether the evidence was legally sufficient to support the guilty verdict.[1]  Under the facts as found by the military judge, and credited as not clearly erroneous by the United States Navy-Marine Corps Court of Criminal Appeals (CCA) and this Court, we agree that Appellant's statements were voluntary and properly admitted into evidence. Because Appellant was not in custody at any time, he was not entitled to receive warnings under Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Further, the record demonstrates that Appellant's statements were the product of his free will and thus voluntarily given.  Considering these statements along with the other evidence presented at trial, there was legally

_____

[1] We granted the following issues:

I.  WHETHER THE LOWER COURT ERRED IN HOLDING THAT THE MILITARY JUDGE DID NOT ABUSE HIS DISCRETION IN FAILING TO SUPPRESS APPELLANT'S STATEMENT TO CIVILIAN AUTHORITIES AS INVOLUNTARY.

II.  WHETHER THE LOWER COURT ERRED IN HOLDING THAT THE EVIDENCE WAS LEGALLY SUFFICIENT TO AFFIRM APPELLANT'S CONVICTION.

2

sufficient evidence to support the verdict.  The decision of the CCA is affirmed.[2]

## II.  Background

On October 13, 2004, Appellant, Ensign (ENS) R, and several other servicemembers assigned to the USS Austin went on liberty to Jacksonville Beach, Florida.  Early the next morning, ENS R filed a police report and complaint with the Jacksonville Beach Police Department against Appellant for sexual assault. Appellant was later interviewed by civilian Detective Amonette, of the Jacksonville Beach Police Department.  By the end of the interview, Appellant had provided oral and written inculpatory statements to Detective Amonette.  These statements were introduced into evidence at Appellant's general court-martial, which ultimately convicted Appellant, contrary to his pleas, of committing an indecent assault on ENS R in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).  The convening authority approved the conviction and the adjudged sentence of a dismissal.  The CCA affirmed, finding that the military judge did not abuse his discretion by admitting Appellant's statements.  United States v. Chatfield,

---

[2] Oral argument in this case was heard at the Texas Tech University School of Law, Lubbock, Texas, as part of the Court's "Project Outreach."  See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).  This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

No. NMCCA 200602256, 2008 CCA LEXIS 143, at *11 2008 WL 961497, at *4 (N-M. Ct. Crim. App. Apr. 10, 2008) (unpublished).

### A.  Facts

Detective Amonette contacted the USS Austin and spoke with Commander (CDR) Landis, the XO, and requested to speak with Appellant, if possible.[3]  CDR Landis told Detective Amonette that Appellant was on shore leave, but that CDR Landis would inform Appellant when he returned that Detective Amonette wished to speak with him.  CDR Landis and the commanding officer of the USS Austin discussed the allegations, but decided not to pursue any action against Appellant under the UCMJ at that time.  Although CDR Landis spoke with a Naval Criminal Investigative Service (NCIS) agent to coordinate the communication with local law enforcement, CDR Landis did not ask NCIS to begin a military investigation of Appellant.

---

[3] As a threshold matter, we agree with the CCA's conclusion that the military judge's findings of fact concerning Appellant's interview are not clearly erroneous, Chatfield, 2008 CCA LEXIS 143, at *8, 2008 WL 961497, at *3.  Consequently, the following summary of facts related to Appellant's statements is largely derived from those findings.  In his brief to this Court, Appellant challenges several of the military judge's factual findings as erroneous and also asserts the military judge failed to credit certain testimony given by witnesses at the suppression hearing.  Contrary to these assertions, we find that the factual findings challenged by Appellant are either irrelevant to the issues at hand or adequately supported by the record.  Those disputed findings that bear on the outcome of this case are analyzed within the discussion section below.

When Appellant returned to the USS Austin, CDR Landis sent word to him that the Jacksonville Beach Police wished to talk to him and that, if Appellant was willing, CDR Landis would arrange a way for him to attend the interview. CDR Landis did not speak directly with Appellant, but rather sent him the message by way of one of two department heads. CDR Landis could not remember which department head, Lieutenant Commander (LCDR) Hofheinz or Lieutenant (LT) Compton, he instructed to notify Appellant. Because the ship was sailing the next day, CDR Landis also told the department head that if Appellant wanted to speak with the police, the interview would have to take place that day. Appellant testified that department head LCDR Hofheinz told him to change into civilian clothes and to go to the chaplain's stateroom, without disclosing why. In the stateroom, the chaplain informed Appellant of the accusations against him.

Some time later, CDR Landis received word back that Appellant was willing to speak with the police. It is not clear whether this word came from LCDR Hofheinz, LT Compton, or the chaplain. CDR Landis and LCDR Hofheinz then went to the chaplain's stateroom, where CDR Landis knocked on the door and said "Let's go." Concerned about not embarrassing Appellant in front of the rest of the crew, CDR Landis informed the officer on duty that he and Appellant, along with LCDR Hofheinz and the

chaplain, were going ashore for dinner.  The four then left the ship and drove by car to the Jacksonville Beach police station.

During the ride to the police station, CDR Landis discussed the plan to drop Appellant off for the interview, while the other three officers would wait at a nearby restaurant.  At no point did Appellant object or express resistance to going to the police station.  Appellant admitted during his suppression hearing testimony that CDR Landis "never told him he had to go to the police interview and never told him to make a statement to the police."

Detective Amonette met Appellant and CDR Landis at the police station around 7:00 that evening.  As it was a Saturday, there were no other police present at the station.  When they arrived at the police station, CDR Landis and Appellant exited the car.  Although CDR Landis testified he expected Appellant to follow him into the station, CDR Landis did not physically escort him in -- CDR Landis did not open the car door for Appellant or hold his arm.  Once CDR Landis and Appellant were inside, Detective Amonette spoke with CDR Landis in the presence of Appellant.  Detective Amonette stated that the interview would only last a few minutes and that CDR Landis could wait at the station.  CDR Landis answered that he and the others were going to have dinner at a nearby restaurant.  Detective Amonette and CDR Landis exchanged phone numbers with the understanding

that Detective Amonette would either drop Appellant off to join the others at the restaurant or call CDR Landis to pick up Appellant.

After CDR Landis and the other officers left, Detective Amonette brought Appellant into his office, rather than one of the station's interrogation rooms. This office contained typical office furniture and Detective Amonette's personal effects. Appellant was neither handcuffed nor placed under arrest at this time. During the interview, Detective Amonette sat at his desk, while Appellant sat in a chair across from the detective. The office doors were open and Appellant had unimpeded access to them.

The military judge found the evidence was insufficient to show that Appellant was advised of his Miranda rights prior to the interview.[4] Detective Amonette did not specifically tell Appellant that he was free to leave or that he did not have to make a statement. After five to ten minutes of questions, Appellant made a written statement to the effect that he did not

---

[4] At the suppression hearing, Detective Amonette testified that his usual practice was to give Miranda warnings before interviews that involved serious charges, such as the charge in this case, but could not recall specifically whether he had warned Appellant. At trial, Detective Amonette testified that he had consulted his notes and confirmed he had given the Miranda warnings prior to the interview. However, this testimony played no part in the military judge's ruling on the motion to suppress because it occurred after he issued the ruling.

remember the events on the night in question.  Before concluding
the interview, Detective Amonette mentioned to Appellant that
the victim had undergone a forensic exam and asked whether
Appellant's DNA might be found on the victim.  Appellant then
asked whether DNA could come from a finger.  After Detective
Amonette answered that it could, Appellant admitted that he
touched the victim "down below" and might have penetrated her.
Detective Amonette was surprised that Appellant gave a
statement.  Detective Amonette consulted the state attorney and
then called ENS R to see if she wanted to pursue the matter.
After the call to ENS R, Detective Amonette was instructed by
the state attorney to arrest Appellant.  The total time that
elapsed between the start of the interview and Appellant's
arrest was less than one hour, and the interview "was conducted
in a conversational manner without the use of intimidating or
coercive techniques."

## B.  Appellant's Motion to Suppress

At his court-martial, Appellant moved to suppress the
statements he made to Detective Amonette.  Specifically,
Appellant argued that his confession was obtained in violation
of his Fifth Amendment privilege against self-incrimination.
This argument was based on Appellant's assertions that:  (1) CDR
Landis's actions were tantamount to an order that Appellant give
Detective Amonette a statement; (2) Detective Amonette failed to

8

give Appellant Miranda warnings despite the fact that he was in custody; and (3) the coercive actions of the civilian police overbore Appellant's free will, making his resulting statements involuntary. At the suppression hearing, the Government presented testimony by Detective Amonette and CDR Landis. The defense presented testimony by the department head LCDR Hofheinz and by Appellant, who testified for the limited purpose of the suppression hearing, pursuant to Military Rule of Evidence 304(f). Neither the chaplain nor LT Compton testified.

As relevant to the granted issue regarding the statements to Detective Amonette, the military judge's conclusions of law were that: (1) Appellant was not in custody and Detective Amonette was not required to administer Miranda warnings before the interview; (2) CDR Landis's actions did not amount to an order to Appellant to make a statement to Detective Amonette; and (3) the civilian police's actions were not coercive.[5] In

---

[5] In addition, in response to Appellant's argument that his statements should be suppressed due to CDR Landis's failure to give Appellant warnings under Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2000), the military judge found that CDR Landis never questioned Appellant. By its terms, Article 31(b), UCMJ, only applies when a member of the military "interrogate[s], or request[s] any statement from, an accused or a person suspected of an offense[.]" Article 31(b), UCMJ. Further, the military judge also found that CDR Landis's actions were not part of a military or civilian law enforcement investigation. See United States v. Loukas, 29 M.J. 385, 387 (C.M.A. 1990) (holding that Article 31, UCMJ, is only triggered when there is a questioner acting in an official capacity and the questioning is done as part of an official law enforcement investigation). Appellant

light of these conclusions, the military judge held that Appellant's statements to Detective Amonette were admissible.

In support of his ruling, the military judge entered findings of fact and made credibility determinations for CDR Landis, Detective Amonette, and Appellant.  He concluded that CDR Landis was "a highly credible witness" who was "forthright and responsive in his answers."  Detective Amonette was "sincere" and "honest" although also an "ill-prepared witness." Finally, the military judge found Appellant was a "defensive" witness with an "aggressive attitude" who was "unconvincing due to the manner, tone, and content of his responses."

### III.  Discussion

#### A.  Standard of Review

A military judge's denial of a motion to suppress a confession is reviewed for an abuse of discretion.  United States v. Pipkin, 58 M.J. 358, 360 (C.A.A.F. 2003).  We will not disturb a military judge's findings of fact unless they are clearly erroneous or unsupported by the record.  United States v. Leedy, 65 M.J. 208, 213 (C.A.A.F. 2007).  However, we review de novo any conclusions of law supporting the suppression ruling, including:  (1) whether someone is in custody for the

---

did not challenge the military judge's conclusion that no Article 31, UCMJ, warnings were required, either before the CCA or in his brief to this Court, and we decline to revisit that issue here.

purposes of Miranda warnings, Thompson v. Keohane, 516 U.S. 99, 112-13 (1995); or (2) whether a confession is involuntary, Arizona v. Fulminante, 499 U.S. 279, 287 (1991); United States v. Bubonics, 45 M.J. 93, 94 (C.A.A.F. 1996).

### B.   Custodial Interrogations

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.   In Miranda, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  It further held that the safeguard must take the form of specific warnings -- "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Id.  Appellant argues that his statements should have been suppressed based on Detective Amonette's failure to give him these Miranda warnings before the interview began.  The Government asserts that warnings were not required because Appellant was not in custody during his interview.

11

In Miranda, the Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. (emphasis added). To answer the question whether an accused is in custody for purposes of Miranda, we consider "all of the circumstances surrounding the interrogation" to determine "how a reasonable person in the position of the [accused] would gauge the breadth of his or her freedom of action." Stansbury v. California, 511 U.S. 318, 322, 325 (1994) (quotation marks omitted). The Supreme Court has stated that two inquiries are essential to a custody determination: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson, 516 U.S. at 112. We consider the facts objectively in the context of a reasonable person's perception when situated in Appellant's position. See Berkemer v. McCarty, 468 U.S. 420, 442 (1984) (holding that a policeman's subjective belief did not bear on whether an accused was in custody).

To be considered in custody for purposes of Miranda, a reasonable person in Appellant's position must have believed he or she was restrained in a "formal arrest or restraint on freedom of movement of the degree associated with a formal

arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (quotation marks and citation omitted). As an initial matter, there is no per se rule that whenever a suspect appears at a police station for questioning, the suspect is therefore in custody. See id. ("[W]e have explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house.'" (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977))). The Supreme Court has looked to several factors when determining whether a person has been restrained, including: (1) whether the person appeared for questioning voluntarily; (2) the location and atmosphere of the place in which questioning occurred, and (3) the length of the questioning. See Mathiason, 429 U.S. at 495 (finding no custody when the appellant voluntarily went to the police station, where he was immediately told he was not under arrest, and left after a thirty-minute interview). In addition, the federal circuit courts of appeals have evaluated the circumstances of an interrogation based on a variety of factors, including "'the number of law enforcement officers present at the scene [and] the degree of physical restraint placed upon the suspect.'" United States v. Mittel-Carey, 493 F.3d 36, 39 (1st Cir. 2007) (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987) (finding custody where the appellant was physically

restrained by eight officers in his home and questioned for ninety minutes to two hours).

We conclude, in agreement with the military judge and the CCA, that Appellant was not in custody. Appellant asserts that the mere involvement of CDR Landis and other officers created a custodial situation from the time he learned from the chaplain that civilian authorities wanted to speak to him up to and including his interview with the civilian police. However, the facts as found by the military judge support the military judge's conclusion that Appellant was not in custody.

1. Voluntary Appearance

As to whether Appellant appeared for questioning voluntarily, we conclude that CDR Landis and the other officers did not compel Appellant to go to the police station. First, as Appellant himself acknowledged, neither CDR Landis nor any other officer ordered Appellant to go to the station or to answer questions once he was there. To the contrary, the military judge found that CDR Landis gave Appellant a choice whether to speak to the civilian police and received word back from Appellant that he voluntarily agreed to go. Although Appellant testified that he "felt compelled" to go to the station, he did not identify any express order from a superior establishing that obligation. While Appellant indicated that he felt compelled by the circumstances of being taken to the police station by his

XO, the military judge found that Appellant's testimony was not credible, and Appellant has not demonstrated on appeal that the military judge's findings of fact related to the alleged compulsion were clearly erroneous. United States v. Owens, 51 M.J. 204, 209 (C.A.A.F. 1999). Second, Appellant was never physically restrained, either on board the USS Austin or in the car on the way to the police station. Third, the actions of CDR Landis and the other officers were designed to facilitate an interview prior to the ship leaving if Appellant chose to participate and to keep the civilian authority's interest in Appellant confidential; a fair reading of the record is that Appellant understood both these things. Finally, we also find it telling that much of the communication was made to Appellant through the chaplain, who is outside the chain of command and normally is not a conduit through which orders are conveyed.

2. Environment of the Interview

Having concluded that Appellant was not ordered to appear at the station, we will look to the environment created by the civilian police -- including the location, atmosphere, and physical restraint involved in the questioning -- to determine whether that environment resulted in a custodial situation. Given the other circumstances of the interview, a reasonable person in Appellant's situation would have realized that he was free to leave and would not have believed he was subject to a

"formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Beheler, 463 U.S. at 1125 (quotation marks and citation omitted).

At the time of the interview, there were no other police officers at the station. In front of Appellant, Detective Amonette stated that it would be a short interview. Further, Detective Amonette and CDR Landis made plans for returning Appellant to the officers for dinner, thereby conveying the impression that Appellant would not have to remain at the police station indefinitely.[6] Cf. Miranda, 384 U.S. at 468 (stating that Miranda warnings are designed to prevent the "inherent pressures" resulting from "an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained"). Detective Amonette took Appellant to his office rather than an interrogation room. They spoke for less than one hour, which included the time Detective Amonette spent calling the State Attorney and ENS R. The entire interview was conducted with the office door open.

---

[6] Appellant disputes the military judge's finding that there were plans in place for Appellant to rejoin the other officers for dinner. However, this finding is supported by CDR Landis's testimony that during the ride to the police station he "talked through the . . . plan to drop [Appellant] off" while "the other three of us were going to dinner at a restaurant . . . and that when the interview was completed, he could either call us, or if we finished dinner, we would come back, pick him up and get him something to eat before we went back to the ship."

16

Appellant was neither handcuffed nor told he could not leave. Detective Amonette described the interview as "very relaxed" and "casual." Appellant admitted that Detective Amonette was "not accusatory" during the interview. That the interview was not coercive is also supported by Detective Amonette's testimony that he was surprised that Appellant made inculpatory statements.

The facts as a whole show that Appellant's interview, which was facilitated by members of his command in a manner designed to avoid embarrassment to Appellant, did not contain the "inherently compelling pressures" with which the Miranda Court was concerned. 384 U.S. at 467. Rather, the atmosphere of the interview would have made it transparent to a reasonable person in Appellant's position that he was not subject to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Beheler, 463 U.S. at 1125.

C. Voluntariness of Appellant's Confession

While Miranda warnings provide procedural safeguards to secure the right against self-incrimination during custodial interrogations, the Due Process Clauses of the Fifth and Fourteenth Amendments protect an accused generally against the admission of any involuntary statements, whether made in or out of custody. Dickerson v. United States, 530 U.S. 428, 433-34 (2000) (reviewing the Court's jurisprudence on involuntary

17

statements). Appellant asserts that the actions taken by CDR Landis and Appellant's other superiors were tantamount to an order requiring Appellant to give the civilian police a statement, rendering Appellant's subsequent statement involuntary.

When introducing a confession, the Government has the burden of showing "the confession is the product of an essentially free and unconstrained choice by its maker." Bubonics, 45 M.J. at 95. We review the totality of the circumstances to determine whether Appellant's "will was overborne and his capacity for self-determination was critically impaired." Id. The factors to consider include "'both the characteristics of the accused and the details of the interrogation.'" Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

This Court has previously found it appropriate to consider the accused's age, education, experience, and intelligence as part of the circumstances bearing on the question whether a statement was voluntary. United States v. Freeman, 65 M.J. 451, 454 (C.A.A.F. 2008). In this case, Appellant was a thirty-six-year-old officer with about twelve years of experience in the Navy, including both active and reserve service. Appellant had experience with several of his subordinates being investigated for crimes under the UCMJ. There is no evidence in the record

that Appellant was of low intelligence or had any mental disability to prevent him from understanding the investigative procedures. Overall, Appellant's characteristics weigh in favor of his statement being found voluntary.

Turning to the details of the meeting with Detective Amonette, the facts of this case do not suggest that CDR Landis expressly or impliedly ordered Appellant to give a statement to the civilian police. Certainly, it is unclear what exact message was communicated to Appellant regarding the interview, and the military judge's findings of fact do not settle this particular point. But the military judge expressly found that CDR Landis sent a message down to Appellant advising him that an interview would be facilitated should he choose to go -- a finding supported by the record. In addition, CDR Landis testified that he had received word that Appellant had agreed voluntarily to speak with the civilian police. The only direct communication from CDR Landis to Appellant before leaving the USS Austin was to say "Let's go" when he arrived at the chaplain's office. None of these statements constituted orders to Appellant that he was either required to go to the police station to be interviewed or that he was required to give a statement once there.

In addition, the military judge specifically found Appellant's testimony that he felt compelled to make a statement

19

was "simply not believable."  We grant deference to this determination because "the military judge was in a unique position to decide the appropriate weight to give appellant's assertion of an overborne will."  United States v. Martinez, 38 M.J. 82, 86 (C.M.A. 1993) ("Where, as here, the military judge expresses special influence of that unique viewpoint on his judgment, that expression must weigh heavily in our reaching our own determination.").[7]

The conclusion that Appellant's statements were voluntary is further buttressed by the lack of evidence of any overreaching tactics employed by Detective Amonette.  As Appellant himself testified, Detective Amonette was not accusatory, which supports the military judge's finding that the interview was "conversational" in tone.  It was short and undertaken with the expectation that Appellant would be free to have dinner with the officers after it was over.  Indeed, Appellant conceded at argument on the suppression motion that there were no coercive police tactics employed.

Viewing the totality of the circumstances, we conclude that neither CDR Landis's actions in facilitating Appellant's

---

[7] In addition, the military judge's specific finding regarding Appellant's credibility explains why he did not rely on speculative answers to defense cross-examination, either from Detective Amonette, that he "had the perception that [Appellant] had the impression that he had to speak with" him, or from CDR Landis, that Appellant "could have" felt compelled to appear for the interview.

interview nor the interview itself created a situation that impaired Appellant's "capacity for self-determination," Bubonics, 45 M.J. at 95, to an extent that his subsequent statements were involuntary.

### D.  Conclusion

The events leading up to and taking place during Detective Amonette's interview of Appellant created neither a custodial situation in which Miranda warnings were required nor a coercive setting in which Appellant's will was overborne.  We conclude that Appellant's statements to Detective Amonette were given voluntarily, and, as such, the military judge did not abuse his discretion by admitting them.

### IV.  Legal Sufficiency of Evidence

In his second point of error, Appellant alleges the evidence was legally insufficient for the panel to return a guilty verdict.  We review questions of legal sufficiency de novo.  United States v. Young, 64 M.J. 404, 407 (C.A.A.F. 2007).  The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."  United States v. Dobson, 63 M.J. 1, 21 (C.A.A.F. 2006) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

The elements of indecent assault under Article 134, UCMJ, are that: (1) the accused assaulted a person; (2) the act was done to gratify sexual desires; and (3) the conduct was prejudicial to good order or of a nature to bring discredit to the armed forces. Manual for Courts-Martial, United States pt. IV, para. 63.b. (2005 ed.). Appellant specifically asserts the second element -- that the act was done with the intent to gratify sexual desires -- was insufficiently proved. After reviewing the record, we hold that the evidence produced by the Government at trial was legally sufficient to prove each element beyond a reasonable doubt.

At trial, in addition to the statements made by Appellant to Detective Amonette, the Government offered testimony from ENS R that she woke on a bed in the group's shared hotel room to find Appellant behind her and her underwear pulled down around her knees. She testified that she felt like she had been penetrated. Lieutenant Junior Grade (LTJG) Buckner, who witnessed the incident, testified that he saw Appellant grabbing ENS R's breast and saw movement under the covers around ENS R's waist. LTJG Buckner also testified that he saw Appellant turn away and button his pants after ENS R awoke. The panel would have considered this evidence in conjunction with Appellant's statements to Detective Amonette that he had rubbed ENS R "down below" and that he might have penetrated her. Based on the

22

evidence presented, the panel could have reasonably concluded that Appellant digitally penetrated ENS R with the intent to gratify his sexual desires and that this conduct was prejudicial to good order and discipline or of a nature to bring discredit to the armed forces.

## V.  Decision

We hold that the military judge did not abuse his discretion by admitting Appellant's statements to Detective Amonette and that there was legally sufficient evidence to support the panel's verdict.  The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.