****CORRECTED COPY – DESTROY ALL OTHERS****

# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

v.

### Airman First Class JAMES M. KERNS
### United States Air Force

ACM 38793

__ M.J. __

## PUBLISHED OPINION OF THE COURT

### 22 September 2016

Sentence adjudged 4 December 2014 by GCM convened at Seymour-Johnson Air Force Base, North Carolina. Military Judge: Wendy L. Sherman.

Approved sentence: Dishonorable discharge, confinement for 4 years, total forfeiture of pay and allowances, and reduction to E-1.

Appellate Counsel for Appellant: Major Michael A. Schrama.

Appellate Counsel for the United States: Colonel Laura J. Megan-Posch; Major Jeremy D. Gehman; Major Meredith L. Steer; and Gerald R. Bruce, Esquire.

Before

SANTORO, SPERANZA, and HARDING
Appellate Military Judges

PUBLISHED OPINION OF THE COURT

SANTORO, Judge:

Officer members sitting as a general court-martial convicted Appellant, contrary to his pleas, of violating a no-contact order on divers occasions, striking his wife with his fist, strangling her with a phone charger cable and his hands, throwing her to the ground, slamming her head into the floor, pulling her hair, covering her mouth with his hands,

forcing her legs apart, killing her cat, and threatening that he would burn down their home, in violation of Articles 92, 128, and 134, UCMJ, 10 U.S.C. §§ 892, 928, 934. Appellant was found not guilty of three specifications of rape, two specifications of sexual assault (charged as alternatives to the rape specifications), two specifications of aggravated assault, one specification of simple assault, and an additional specification of communicating another threat to SK. The adjudged and approved sentence was a dishonorable discharge, confinement for four years, total forfeiture of pay and allowances, and reduction to E-1.

Appellant raises six assignments of error: (1) the staff judge advocate erred in the post-trial recommendation to the convening authority; (2) the sentence is inappropriately severe; (3) the findings of guilty are factually insufficient; (4) the military judge erred in denying the motion to suppress Appellant's statements to investigators; (5) the court-martial lacked subject-matter jurisdiction over an Article 134, UCMJ, offense; and (6) the military judge erroneously denied a motion to sever. We find that the military judge abused her discretion in denying Appellant's motion to suppress; the court-martial had jurisdiction over the Article 134, UCMJ, offense at issue; and the military judge did not err in denying the motion to sever. The remaining assignments of error are rendered moot by our resolution of the suppression issue.

*Background*

Appellant joined the Air Force in December 2012. Five months later, in May 2013, he and SK married after having dated for approximately two weeks. Appellant, SK, and SK's infant daughter moved into base housing shortly thereafter.

Later in 2013, SK learned that Appellant had been frequenting online dating sites and exchanging e-mails with women she did not know. SK suggested divorce. Appellant became angry and told SK that divorce "was not an option."

Their relationship continued to deteriorate. On 14 December 2013, Appellant and SK argued about the location of a cellular telephone. SK testified that Appellant blocked her from leaving their bedroom, threw her onto the bed, slammed her head against the wall, and repeatedly punched her in the torso. A houseguest who was present during the altercation called 9-1-1. Military and civilian law enforcement responded. Civilian police arrested Appellant and SK, both of whom spent three days in jail. Civilian prosecutors filed criminal charges against both individuals but later dropped all charges.

The relationship between Appellant and SK improved for a short time but ultimately devolved into acrimony. SK testified that on one occasion after returning home from visiting a friend, she lay in bed next to Appellant watching a movie when, without warning, he grabbed and choked her with his hands and then with a cellular telephone charging cable. He then grabbed SK by the hair, slammed her face into the floor, and shoved her into a closet. When SK tried to flee, Appellant grabbed her and prevented her from leaving.

Appellant also grabbed a knife, put it to his throat, and told SK he was going to kill himself. SK testified that she was able to stop the assault by convincing Appellant that she loved him and wanted to have sex with him.

SK reported the assault the following day, which led to Appellant's first interview with agents from the Air Force Office of Special Investigations (AFOSI). Appellant's first sergeant and, later, his commander issued "no-contact" orders directing Appellant not to communicate with SK.

Appellant was ordered to live in the dormitory so SK and her daughter could remain in their home. SK, however, decided to take her daughter to Kentucky where they had family. Appellant repeatedly contacted SK by telephone and text message and sent her flowers, apologizing for his behavior and asking if they could "work things out."

When SK returned from Kentucky, she found Appellant waiting for her at their home. He had placed a mattress on the living room floor and made a display of several items from their wedding, including photographs and SK's wedding dress. An argument quickly ensued. Appellant told SK that after she left for Kentucky, he broke her eight-week old kitten's legs, snapped its neck "to put it out of its misery," and threw it in the trash. SK's tears at hearing this further enraged Appellant, who choked her and covered her mouth.

As the argument progressed, Appellant told SK he wanted to have sex with her. She testified that although she said "no," Appellant forced her legs apart and lay on her. Eventually she allowed him to have sex with her, but when the sex ended quickly, Appellant became angrier. He went to the garage and returned with a container of gasoline, which he placed on the kitchen floor. He told SK he was going to set her and the house, with her infant daughter in it, on fire. Appellant eventually left the residence and SK reported the incident to law enforcement later that day.

Pursuant to Mil. R. Evid. 413, the Government offered testimony from AG. AG attended high school with Appellant and testified that when she was 14 or 15 years old, Appellant repeatedly raped and forcibly sodomized her during what was, at other times, a consensual sexual relationship. AG also testified that during one of the rapes, Appellant physically restrained her with zip ties. AG reported the assaults to civilian law enforcement. She said the police talked her out of going forward with the case.

Additional facts necessary to resolve the assignments of error are included below.

*Denial of Motion to Suppress*

Appellant argues that the military judge erred when she denied his motion to suppress statements he made to investigators. We review a military judge's denial of a

motion to suppress for an abuse of discretion. *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citing *United States v. Pipkin*, 58 M.J. 358, 360 (C.A.A.F. 2003)). Under this standard, the military judge's findings of fact are upheld unless they are clearly erroneous or unsupported by the record. *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007). We review de novo any conclusions of law supporting the denial of a motion to suppress a confession. *Chatfield*, 67 M.J. at 437. A military judge abuses her discretion when (1) the findings of fact upon which she predicates her ruling are not supported by the evidence of record; (2) incorrect legal principles were used; or (3) her application of the correct legal principles to the facts is clearly unreasonable. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

While the military judge made extensive findings of fact, the findings critical to the resolution of this issue are few. Those noted here are supported by the record and not contested by Appellant. On 18 January 2014, law enforcement was dispatched to Appellant's residence. SK told responding personnel that Appellant physically assaulted her and, in an attempt to get Appellant to stop the assault, she convinced him to have sex. AFOSI agents transported Appellant to their office. Special Agent (SA) PA advised Appellant of his rights under Article 31, UCMJ, 10 U.S.C. § 831, and told him he was suspected of "assault." Appellant acknowledged his rights and requested legal counsel. SA PA terminated the interview.

Ten days later, on 28 January 2014, AFOSI agents met SK at her residence for a previously-scheduled follow-up interview. During the interview, SK provided additional details about the 18 January incident and also alleged that Appellant had committed new crimes—violation of a no-contact order, physical assault, and forced sexual intercourse— that same day, 28 January, before the agents arrived.

After taking this second statement from SK, agents arranged to have Appellant brought to his first sergeant's office. AFOSI apprehended Appellant there and transported him to the AFOSI detachment in handcuffs. SA PA brought Appellant into an interview room and told him that they wanted to discuss what had occurred that day but that they did not intend to talk about the events of 18 January. SA PA further told Appellant that he was now suspected of "sexual assault." Appellant said he understood his rights, did not want an attorney present, and was willing to speak with investigators. SA PA began the questioning by asking, "What has happened in your life from [19 January] until five minutes ago when we put you in handcuffs?"

During the subsequent discussion, Appellant repeatedly referred to what happened on 18 January. SA PA did not directly ask any questions about the 18th, but after Appellant referred to that day several times, SA PA asked him if he wanted to talk about that as well. Appellant responded that he did. SA PA then re-advised Appellant of his Article 31,

UCMJ, rights, this time for "assault" on 18 January. Appellant acknowledged and waived his rights.

Appellant argues that his 28 January statement should have been suppressed because the same agent who interviewed him on both the 18th and 28th knew Appellant had previously requested counsel for the 18 January incident and "merely characterized [the 28 January incident] as potentially violating a different statute." In support of his argument, Appellant cites Article 31, UCMJ, the Military Rules of Evidence, and decisions of the United States Supreme Court interpreting and applying the Fifth Amendment, but Appellant does not clearly identify the right(s) he claims was violated.

The oft-cited right to remain silent and right to have counsel present have multiple sources: the United States Constitution, specifically the Fifth and Sixth Amendments; the Uniform Code of Military Justice; the Military Rules of Evidence; and decisions of our superior courts interpreting these rights.[1] While the protections afforded an accused by these sources may overlap, they are not coextensive and require independent analysis. *See United States v. Evans*, 75 M.J. 302, 305 (C.A.A.F. 2016).

*a. Constitutional Protections*

The Fifth Amendment to the United States Constitution states, in part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[2] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. *Id.* at 467. The Court noted that being held "incommunicado" in an "unfamiliar," "police-dominated atmosphere," *id.* at 456-57, involves psychological pressures "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467.

To combat the possible coercive effect of those pressures, *Miranda* created a rule that police officers must warn a suspect prior to custodial interrogation that he has the right to remain silent and the right to the presence of an attorney. After the warnings are given, the interrogation must cease if the suspect indicates that he wishes to remain silent. If the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. *Id.* at 474.

Later, in *Edwards v. Arizona*, 451 U.S. 477 (1981), the Court added a second protective layer, holding that once an accused has invoked his right to have counsel during a custodial interrogation, "[he] is not subject to further interrogation by the authorities until

---

[1] The Sixth Amendment right to counsel is inapplicable to this case as charges had not yet been preferred at the time of either interview. *Kirby v. Illinois*, 406 U.S. 682, 688 (1972) (plurality opinion); *United States v. Adams*, 45 C.M.R. 175, 179 (1972); Mil. R. Evid. 305(c)(3).

[2] U.S. CONST. amend. V.

counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85.

The Court's rationale in *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel, . . . any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Arizona v. Roberson*, 486 U.S. 675, 681 (1988) (citations omitted).

The prohibition of subsequent custodial interrogation applies even when the later interrogation is about a different crime, *id.*, or when the subsequent interrogation is conducted by a different law enforcement authority. *Minnick v. Mississippi*, 498 U.S. 146 (1990). It applies even when the suspect has consulted an attorney during the interim. *Id.*

Four years before Appellant's trial, in *Maryland v. Shatzer*, 559 U.S. 98 (2010), the Supreme Court was confronted with the question of whether law enforcement can re-initiate interrogation after the right to counsel has been invoked and there has been a break in custody. The Supreme Court noted that the "implicit assumption" in the *Edwards* rule

> is that the subsequent requests for interrogation pose a significantly greater risk of coercion. That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated—pressure likely to 'increase as custody is prolonged.' The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of 'prolonged police custody' by repeatedly attempting to question a suspect who previously requested counsel until the suspect is 'badgered into submission.'

*Id.* at 105 (citations omitted).

The "paradigm" *Edwards* case is one in which a suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated. *Id.* "After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, 'thrust into' and isolated in an 'unfamiliar,' 'police-dominated atmosphere,' where his captors 'appear to control [his] fate.'" *Id.* (citations omitted).

6                                                                 ACM 38793

The Court also noted, however, that when

> a suspect has been released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation, there is little reason to think that his change of heart regarding interrogation without counsel has been coerced. He has no longer been isolated. He has likely been able to seek advice from an attorney, family members, and friends. And he knows from his earlier experience that he need only demand counsel to bring the interrogation to a halt; and that investigative custody does not last indefinitely. In these circumstances, it is farfetched to think that a police officer's asking the suspect whether he would like to waive his *Miranda* rights will any more 'wear down the accused' than did the first such request at the original attempted interrogation—which is of course not deemed coercive. His change of heart is less likely attributable to 'badgering' than it is to the fact that further deliberation in familiar surroundings has caused him to believe (rightly or wrongly) that cooperating with the investigation is in his interest.

*Id.* at 107-08.

To resolve this tension, the Court established a bright-line rule that *Edwards'* prohibitions would not apply when there has been at least a 14-day break in custody between initial and subsequent custodial interrogations. *Id.* at 110-11. Among other benefits, the 14-day rule prevents police from releasing a suspect from custody, even if only for a few moments or days, to enable them to reinitiate questioning. *Id.*

Our superior court has cited *Shatzer* in only one case and for a proposition other than the 14-day bright line rule, but nothing in our superior court's treatment of *Shatzer* suggests that the 14-day rule is inapplicable to the military. *United States v. Hutchins*, 72 M.J. 294, 298 (C.A.A.F. 2013). To the contrary, our superior court cited *Shatzer* as it concluded that the government had violated an accused's Fifth Amendment right to counsel by not providing him with an attorney after he requested one. *Id.*

*b. Protections Provided by the UCMJ*

Article 31(b), UCMJ, states:

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the

accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Thus, if a person subject to the UCMJ interrogates or requests any statement from a person suspected of an offense, the questioner must advise the person of his or her rights under Article 31(b), UCMJ. Our superior court has repeatedly affirmed that spontaneous statements, although possibly incriminating, are not within the bounds of Article 31, UCMJ. *See, e.g., United States v. Lichtenhan*, 40 M.J. 466, 470 (C.M.A. 1994); *United States v. Vitale*, 34 M.J. 210, 212 (C.M.A. 1992).

As our superior court recently noted in *Evans*, "when an Article 31(b), UCMJ, violation occurs, the appropriate test for prejudice depends on the facts and circumstances presented." 75 M.J. at 303. Our superior court set forth which test applies:

> If the Article 31(b), UCMJ, violation also implicates the constitutional rights of the accused, then the harmless beyond a reasonable doubt test applies. But if the Article 31(b), UCMJ, violation stands alone as a statutory violation (that is, if the violation does not also present a constitutional violation) then the nonconstitutional test for prejudice—spelled out in *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)—applies.

*Evans*, 75 M.J. at 303.

*c. Implementation of the Protections and Privileges by the Military Rules of Evidence[3]*

The Military Rules of Evidence also recognize that the privileges and protections emanate from three distinct sources: the Fifth Amendment, Article 31, and the Military Rules of Evidence themselves. Mil. R. Evid. 301(a).

Mil. R. Evid. 305(c)(2) states that when a person who is suspected of an offense *and* is subject to custodial interrogation requests counsel, any statement made after the invocation of the right to counsel is inadmissible unless counsel was present for the interrogation. Mil. R. Evid. 305(c)(2). When one subjected to custodial interrogation requests counsel, any subsequent waiver obtained during a custodial interrogation

---

[3] Executive Order 13,643 made several changes to the existing Military Rules of Evidence, most notably moving provisions of what had been Mil. R. of Evid. 304 and 305 to other locations within those rules. Exec. Order No. 13,643, 78 Fed. Reg. 29559 (15 May 2013). The military judge's decision cites the previous Rule numbers; this opinion cites the Rules currently in effect. Mil. R. Evid. 301(a) remains substantively unchanged. What was Mil. R. Evid. 305(f)(2) is now found at Mil. R. Evid. 305(c)(2). What was Mil. R. Evid. 305(g)(2)(B) is now found at Mil. R. Evid. 305(e)(3)(A).

ACM 38793

concerning the same or different offenses is invalid unless the prosecution can demonstrate by a preponderance of the evidence that the accused initiated the communication leading to the waiver or that the accused "has not continuously had his . . . freedom restricted by confinement, or other means, during the period between the request for counsel and the subsequent waiver." Mil. R. Evid. 305(e)(3)(A).

Notably, Mil. R. Evid. 305(e)(3)(A) appears to allow law enforcement to reinitiate interrogation as long as the accused has not *continuously* had his freedom restricted by confinement, and this appears to be exactly the type of police abuse the *Shatzer* rule was designed to prevent.

### d. Analysis

As noted above, the right to remain silent and the right to counsel emanate from both the Constitution and military law, but their breadth, applicability, and the potential remedies for violations are not coextensive. *See Evans*, 75 M.J. 302. Appellant is entitled to the most favorable of these privileges under the facts of his case. Mil. R. Evid. 301(a).

We begin with the Fifth Amendment privilege. None of the parties below, or even Appellant before us, argued, cited, or addressed the *Shatzer* bright-line 14-day waiting period before a subsequent custodial interrogation could occur. Perhaps because of this oversight, the military judge did not make any findings of fact or reach conclusions of law with respect to whether the 18 January 2014 interview constituted custodial interrogation. If it did, *Shatzer* would appear to render all of Appellant's statements on 28 January inadmissible as well as any evidence derived therefrom, as we easily conclude that it was law enforcement that initiated the second interrogation—albeit purportedly about only the 28 January offenses.[4] Conversely, if the 18 January interview was non-custodial, then the *Edwards/Shatzer* prophylaxis would provide no relief because 28 January would then have been Appellant's first custodial interview.

The Government argues that we should use our Article 66(c), UCMJ, 10 U.S.C. § 866(c), fact-finding power to supplement the military judge's findings and hold that the 18 January interview was non-custodial.

---

[4] Although SA PA stated he would focus on the 28 January incident, the first thing he said to Appellant on 28 January was a reference to his 18 January interrogation. He told Appellant that "last time they talked" they "weren't able to get anywhere," "the cards are not stacked in [his] favor," and that he wanted to hear Appellant's side so "I don't have to bust in and throw cuffs on you." SA PA reminded Appellant that AFOSI had all of his information already on file because of his prior interrogation. He also told Appellant that he "missed an opportunity" during the prior interrogation and that his questions, although beginning with 28 January, would "tie back to what happened" at the prior interrogation. The military judge did not address these statements in her analysis; instead, she focused on whether Appellant initiated the discussion about the 18 January incident some time after he purportedly waived his rights with respect to the 28 January incident. We need not reach the question of whether Appellant did, in fact, initiate the discussion about the 18 January incident, as we conclude that SA PA re-initiated interrogation at the outset. *See United States v. Hutchins*, 72 M.J. 447 (C.A.A.F. 2013) (investigator's request for consent to search, after subject had requested counsel, constituted a re-initiation of interrogation under the facts of that case).

In *Miranda*, the Supreme Court defined custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' To answer the question whether an accused is in custody for purposes of *Miranda*, we consider 'all of the circumstances surrounding the interrogation' to determine 'how a reasonable person in the position of the [accused] would gauge the breadth of his or her freedom of action.' The Supreme Court has stated that two inquiries are essential to a custody determination: 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' We consider the facts objectively in the context of a reasonable person's perception when situated in Appellant's position.

To be considered in custody for purposes of *Miranda*, a reasonable person in Appellant's position must have believed he or she was restrained in a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' As an initial matter, there is no per se rule that whenever a suspect appears at a police station for questioning, the suspect is therefore in custody. The Supreme Court has looked to several factors when determining whether a person has been restrained, including: (1) whether the person appeared for questioning voluntarily; (2) the location and atmosphere of the place in which questioning occurred, and (3) the length of the questioning. In addition, the federal circuit courts of appeals have evaluated the circumstances of an interrogation based on a variety of factors, including 'the number of law enforcement officers present at the scene [and] the degree of physical restraint placed upon the suspect.'

*Chatfield*, 67 M.J. at 437-38 (citations omitted).

In support of its argument, the Government notes that the military judge explicitly found the 28 January interview custodial and therefore, by inference from the omission, must have necessarily found that the 18 January interview was not. The Government also notes that the Air Force Form 3589 (interview record) for the 18 January interview does not indicate that Appellant was in custody and that the interview lasted only seven minutes.

However, other evidence in the record suggests that the interview may have been custodial. Appellant was placed in the back of a police car and driven from the scene to the AFOSI office. While there, he was fingerprinted and photographed, actions that are not usually taken with mere witnesses. SA PA described the 18 January interview as a "subject interview." Appellant was also not allowed to depart AFOSI on his own, but rather released to his first sergeant. The charge sheet indicates that Appellant was in civilian pre-trial confinement on 18-19 January 2014.[5]

The record is silent as to whether the 18 January interview was recorded. The 28 January interview was. While this difference may point to one interview's being custodial and the other not, there is no evidence in the record from which we can draw that inference.

Potentially relevant 18 January interview facts for which there is no evidence in the record are the following: whether Appellant was handcuffed before being transported to AFOSI; whether Appellant went to AFOSI voluntarily; whether Appellant's command ordered him to go with investigators; whether agents told him he was under apprehension or arrest; whether there were any restrictions placed upon him during or after the interrogation; as well as other facts from which we can determine how a reasonable person in Appellant's shoes would gauge the breadth of his freedom of action.

In her analysis of the motion, the military judge cited *Edwards* and determined that *Edwards* was inapplicable to this case because Appellant "was not in continuous custody." While the fact that Appellant was not in continuous custody was not in dispute, the military judge's finding that Appellant was not in *continuous* custody can be read two ways: either Appellant was in custody, then was released, then placed back into custody; or that the 28 January interview was the first time Appellant was ever in custody.

We highlight these evidentiary deficiencies to demonstrate why we decline to exercise our Article 66(c), UCMJ, fact-finding authority to supplement the military judge's findings. A record this undeveloped precludes us from meaningfully exercising our fact-finding power, particularly when we have neither seen nor heard the witnesses. Moreover, it is apparent from the record that the military judge did not consider *Shatzer* and its application to these facts. While the military judge did consider and apply Mil. R. Evid. 305(e)(3)(A), which purported to implement Appellant's Fifth Amendment protections, it did not for the reasons explained above.[6] Because we conclude that applying *Shatzer* was

---

[5] We do not know whether that is a scrivener's error that was intended to reference Appellant's confinement in December 2013 after being arrested by civilian police or whether there was another period of civilian pretrial confinement that is not otherwise indicated in the record.

[6] It is unclear whether the failure to amend Mil. R. Evid. 305(e)(3)(A) to implement the *Shatzer* rule is a drafter's oversight or an affirmative effort to avoid *Shatzer*. Nevertheless, we conclude we are bound to apply the clear precedent of the Supreme Court as there has been no argument made that *Shatzer* is (or should be) inapplicable to the military.

critical to resolving the motion to suppress, and because the military judge failed to use the correct legal principles, she must be found to have abused her discretion.[7]

The Government argues that even if the 18 January interview were custodial, and therefore the *Shatzer* rule applied, AFOSI was not precluded from interviewing Appellant about the 28 January events because Appellant's 18 January invocation of rights cannot bar his later custodial interrogation about a crime that had not yet occurred. We are not persuaded.

There is nothing in *Shatzer* that suggests the 14-day waiting period is offense-specific; to the contrary, *Shatzer* implements the Fifth Amendment's protections which are *not* offense-specific. *Roberson*, 486 U.S. 675. Moreover, all of the cases cited by the Government on this point pre-date *Shatzer*. The Government's concern that allowing Appellant to invoke the *Shatzer* 14-day rule in this case would "provide immunity . . . so he can commit crimes with impunity and render law enforcement helpless to investigate and interview suspects about these newly-committed crimes" is off the mark. Nothing about our resolution of this case renders law enforcement helpless. To the contrary, had law enforcement complied with existing law, or had the prosecution been aware of the law and developed the necessary record, the outcome may well have been different.

Having found error, we now turn to prejudice. Because the violation of Appellant's Fifth Amendment right, as implemented by *Shatzer*, is a constitutional error, we cannot affirm his conviction unless we are convinced beyond a reasonable doubt that the admission of his statement was harmless. *Evans*, 75 M.J. at 302.

The military judge suppressed those portions of Appellant's statement in which he discussed killing SK's cat (Additional Charge III, Specification 1).[8] There appears to be no derivative evidence obtained through the use of Appellant's statement relating to this specification. The members were instructed that they could not consider evidence that Appellant may have assaulted SK when they determined whether Appellant killed her cat. In the absence of evidence to the contrary, the members are presumed to follow the military judge's instructions. *See United States v. Piolunek*, 74 M.J. 107, 111 (C.A.A.F. 2015), quoting *United States v. Ricketts*, 1 M.J. 78, 82 (C.M.A. 1975) (stating that members are presumed to follow the instructions of the military judge absent evidence to the contrary). We, therefore, conclude that the erroneous admission of Appellant's statement was harmless beyond a reasonable doubt with respect to his conviction of Additional Charge III, Specification 1.

---

[7] We take this opportunity to remind all trial participants that they should remain current on the law relevant to issues in dispute and conduct updated research as necessary.

[8] The military judge found that Appellant was not properly warned pursuant to Article 31, UCMJ, 10 U.S.C. § 831, that he was suspected of killing the cat, and therefore suppressed that portion of his statement.

We reach a different result, however, with respect to the other charges and specifications. Appellant's 28 January interview with SA PA was far-reaching and addressed his entire relationship with SK, including the charged verbal and physical arguments and the violation of the "no-contact" orders. Appellant either admitted, corroborated, or did not dispute committing many of the acts of which he was convicted. SA PA's interview of Appellant figured prominently in both opening statements and closing arguments.

Erroneous admission of a confession "requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("[T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct."); *see also United States v. Ellis*, 57 M.J. 375, 381 (C.A.A.F. 2002) ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.").

Viewing the record as a whole, we are not convinced that the erroneous admission of Appellant's statement was harmless beyond a reasonable doubt. We must, therefore, set aside the findings on the affected charges and the sentence.[9] Our resolution of this issue does not reach the ultimate question of whether Appellant's statement *could* be admissible on remand if a sufficient factual foundation exists. Rather, we hold that the military judge abused her discretion in failing to use the correct legal principles to resolve the suppression motion. *See United States v. Mott*, 72 M.J. 319 (C.A.A.F. 2013).[10]

*Subject-Matter Jurisdiction*

Appellant argues that the court-martial did not have subject-matter jurisdiction over the Article 134, UCMJ, offense, which alleges Appellant killed SK's cat. The specification alleged that Appellant did, "between on or about 18 January 2014 and on or about 28 January 2014, wrongfully kill the cat belonging to [SK], such conduct being of a nature to bring discredit upon the armed forces."

We review the existence of jurisdiction de novo. *United States v. Harmon*, 63 M.J. 98, 101 (C.A.A.F. 2006). Generally, for a court-martial to have jurisdiction, there must be jurisdiction over the offense, jurisdiction over the accused, and a properly convened and composed court-martial. *Id.* Appellant contests the existence of the first prerequisite: jurisdiction over the offense.

---

[9] Because the Fifth Amendment provides Appellant the relief he seeks, we need not analyze whether Article 31, UCMJ, or the Military Rules of Evidence would afford greater protections on these facts.

[10] We decline to order a hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411 (1967), to resolve factual deficiencies, instead following our superior court's approach in *Mott* of remanding for rehearing.

Article 134, UCMJ, proscribes three categories of conduct: conduct which is prejudicial to good order and discipline (clause 1), conduct which is service discrediting (clause 2), and conduct which constitutes a "crime or offense not capital" (clause 3).

Appellant argues that because the military has what is commonly known as "proprietary jurisdiction" over Seymour-Johnson Air Force Base, and the local prosecutor did not cede authority to the Air Force to prosecute this offense, the court-martial lacked subject-matter jurisdiction.[11] In support of his argument, Appellant cites the Federal Assimilative Crimes Act (ACA), 18 U.S.C. § 13, and argues that the ACA "cannot be invoked with respect to crimes committed in places which—although they may be owned by the United States—are not subject to its 'exclusive or concurrent jurisdiction.'" *United States v. Irvin*, 21 M.J. 184, 186 (C.M.A. 1986).

The ACA states, in pertinent part:

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section [18 USC § 7], or on, above, or below any portion of the territorial sea of the United States not within the jurisdiction of any State, Commonwealth, territory, possession, or district is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

The ACA establishes "crimes or offenses not capital" within the meaning of Article 134, clause 3. Therefore, acts which constitute a violation of a state criminal statute may be prosecutable by court-martial under Article 134, clause 3, but only if committed in a location where the ACA has effect (i.e., an area in which the United States has legislative jurisdiction).

Here, however, Appellant was charged under Article 134, clause 2 (service discrediting conduct), not clause 3. The specification at issue did not allege, nor was the Government required to establish, that Appellant's actions violated a state statute proscribing animal cruelty. Instead, the Government charged and was required to prove that Appellant's conduct was service discrediting.

---

[11] "Proprietary jurisdiction," in this context, signifies that "the possession [of the real property] by the United States is 'simply that of an ordinary proprietor." *United States v. Irvin*, 21 M.J. 184, 186 (C.M.A. 1986).

It appears that the parties, both below and on appeal, misunderstood the nature of proprietary jurisdiction. Simply put, when an active duty Airman commits an offense under the UCMJ on an installation over which the United States has "proprietary jurisdiction," a court-martial still has subject-matter jurisdiction over the offense. The installation's jurisdictional status is irrelevant to whether a court-martial has subject-matter jurisdiction to try an offense under the UCMJ.[12] *See Solorio v. United States*, 483 U.S. 435 (1987).

Both below and on appeal, the parties disagreed about whether the local prosecutor had ceded "jurisdiction" to the Air Force to try this offense. The military judge found as a fact that he had. However, the parties' arguments about whether the local district attorney had ceded "jurisdiction" to the Air Force are similarly not relevant to whether the court-martial had jurisdiction over the offense. Jurisdiction is created by operation of law and cannot be "acquired" or "ceded" either by the Air Force or a local prosecutor. However, when a member is subject to both UCMJ and state (or foreign) jurisdiction, the Air Force as a matter of policy will coordinate with the relevant civilian prosecutor to determine which sovereign will *exercise* the jurisdiction it already possesses. *See* Air Force Instruction 51-201 *Administration of Military Justice*, ¶ 2.6 (6 June 2013).

Because the specification at issue was charged as an Article 134, clause 2 offense, and the only challenge on appeal is that the court-martial lacked subject-matter jurisdiction over that offense, Appellant is entitled to no relief. The court-martial had jurisdiction over Appellant and his offenses and was properly constituted.

### *Denial of Motion to Sever*

Appellant also argues that the military judge abused her discretion in denying his motion to sever the allegation that Appellant killed the cat from the remaining offenses. Rule for Courts-Martial (R.C.M.) 906(b)(10) permits a party to move for severance of offenses, "but only to prevent manifest injustice." The discussion to this rule states, "[o]rdinarily, all known charges should be tried at a single court-martial" and "[j]oinder of minor and major offenses, or of unrelated offenses, is not alone a sufficient ground to sever offenses." R.C.M. 906(b)(10), Discussion.

We review a military judge's decision to deny a severance motion for an abuse of discretion. *United States v. Duncan*, 53 M.J. 494, 497-98 (C.A.A.F. 2000). To prevail on appeal, Appellant must demonstrate more than the fact that separate trials would have provided a better opportunity for an acquittal; he must show that the ruling caused actual prejudice by preventing him from receiving a fair trial. *Id.* When reviewing a military judge's denial of a severance motion, we examine whether: (1) the findings reveal an

---

[12] On a proprietary-jurisdiction installation, state offenses cannot become Federal offenses under the ACA (because of the installation's jurisdictional status), and therefore there would be no "offense under the UCMJ."

impermissible crossover of evidence; (2) the evidence of one offense would be admissible proof of the other; and (3) the military judge provided a proper limiting instruction. *United States v. Curtis*, 44 M.J. 106, 128 (C.A.A.F. 1996).

The military judge found that Appellant's killing of SK's cat would have been relevant and admissible to prove SK's fear of death or grievous bodily harm, as well as an implied threat that similar violence might be levied against her if she denied Appellant intercourse. Appellant does not meaningfully contest those findings.

Appellant was acquitted of the most serious charges he faced and he points to nothing suggesting that the findings reveal an impermissible cross-over of evidence. He also concedes that the military judge provided an appropriate limiting instruction, but argues that "given the uniqueness of the cat slaying and the climate at the time of trial, it is clear that the Appellant was unduly prejudiced . . . since the court members might have been subject to a spillover effect regardless of the spillover instruction." We find that Appellant has failed to meet his burden to show that the military judge abused her discretion.

We decline to engage in speculation about the "climate" at the time of trial nor will we assume, without evidence, that the members disregarded the military judge's instructions. *See Piolunek*, 74 M.J. at 111 (quoting *Ricketts*, 1 M.J. at 82) ("members are presumed to follow the instructions of the military judge absent evidence to the contrary").

## Conclusion

The findings of guilt as to Specification 1 of Additional Charge III and of Additional Charge III are affirmed. All other findings of guilty and the sentence are set aside. The record of trial shall be returned to The Judge Advocate General. A rehearing is authorized as to the findings of guilt that have been set aside and as to sentence.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

16                                                                                   ACM 38793