# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
WOLFE, SALUSSOLIA, and ALDYKIEWICZ
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist JOSHUA D. WHITE**
**United States Army, Appellant**

ARMY 20170147

Headquarters, Fort Hood
G. Bret Batdorff, Military Judge
Colonel Susan K. Arnold, Staff Judge Advocate

For Appellant:  Captain Patrick G. Hoffman, JA (argued); Lieutenant Colonel
Christopher D. Carrier, JA; Captain Patrick G. Hoffman, JA (on brief); Lieutenant
Colonel Tiffany D. Pond, JA; Major Jack D. Einhorn, JA; Captain Patrick G.
Hoffman, JA (on reply to specified issue).

For Appellee:  Captain Marc B. Sawyer, JA (argued); Colonel Steven P. Haight, JA;
Lieutenant Colonel Eric K. Stafford, JA; Major Hannah E. Kaufman, JA; Captain
Marc B. Sawyer, JA (on brief and supplemental brief).

8 March 2019

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ALDYKIEWICZ, Judge: (Part I – Suppression of Admissions)

Appellant stands convicted of sexually assaulting two victims, one adult (BC),
and one minor.[1]  On appeal, appellant asserts the military judge abused his discretion
by denying appellant's motion to suppress his admissions to a civilian detective.  We

---

[1] A panel sitting as a general court-martial with enlisted representation convicted
appellant, contrary to his pleas, of one specification of sexual assault of an adult
victim and two specifications of sexual assault of a child, violations of Article 120
and 120b, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 920b (2012)
[UCMJ].  The convening authority approved the findings and appellant's adjudged
sentence of a dishonorable discharge, three months of confinement, forfeiture of all
pay and allowances, and reduction to the grade of E-1.

disagree. The detective violated neither appellant's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), nor his rights under Article 31(b), UCMJ.

On brief, appellant argued a civilian detective failed to read appellant his rights under *Miranda* prior to interviewing appellant in an office of the U.S. Army Criminal Investigation Command (CID). We specified two additional issues:

> WHETHER THE MILITARY JUDGE ERRED BY NOT SUPPRESSING APPELLANT'S STATEMENT THAT WAS TAKEN WITHOUT APPELLANT BEING ADVISED OF HIS RIGHTS UNDER ARTICLE 31, UCMJ. *SEE, E.G., UNITED STATES V. REDD,* 67 M.J. 581, 586 (ARMY CT. CRIM. APP. 2008).

> WHERE APPELLANT'S PRETRIAL ADMISSIONS [ARE] BASED ON AN INCORRECT BELIEF THAT A PERSON CANNOT LEGALLY CONSENT TO SEXUAL INTECOURSE AFTER CONSUMING ALCOHOL, IS HIS CONVICTION OF THE SPECIFICATION OF CHARGE I FACTUALLY SUFFICIENT?

We find the military judge did not err in denying appellant's suppression motion as appellant's interview triggered neither his *Miranda* rights nor his rights under Article 31(b), UCMJ.[2]

## BACKGROUND

The issues before us relate to a sexual encounter between appellant and BC on or about 23 May 2015. Appellant was later interviewed about that encounter by Detective Chancellor of the Round Rock, Texas Police Department. The encounter ultimately formed the basis of appellant's conviction of The Specification of Charge I at his court-martial—sexual assault of BC when BC was incapable of consenting to the sexual act due to impairment by alcohol.

---

[2] Appellant's interview with the civilian detective only related to his alleged offense against BC. In light of the entire record, we find appellant's conviction of sexual offenses against a minor legally and factually sufficient. After due consideration of appellant's second assignment of error, post-trial delay in violation of *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), as well as those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), we have determined they warrant neither discussion nor relief.

*A. BC's Relationship with Appellant and Her Intoxication on 23 May 2015*

Appellant and BC met on Tinder, an internet dating application. After exchanging several text and Facebook messages, they met when appellant picked BC up at work and drove her to her home, this being their first in-person encounter. Shortly after arriving at BC's residence, appellant and BC engaged in consensual sexual intercourse. Appellant and BC met nearly a dozen times in total. Each meeting led to sexual intercourse, and each meeting—except the first—involved the consumption of alcohol. BC usually consumed more alcohol than appellant.

On the evening of 23 May 2015, BC went out to a local club with two acquaintances, Ms. Smith and Mr. Saucedo, neither of whom had any prior knowledge regarding BC's experience with alcohol; this was their first night out together. The three arrived at the club in Mr. Saucedo's vehicle sometime between 2200 and 2230 hours. While all three drank that night, BC consumed the most. Sometime around midnight, appellant arrived at the club where, for about an hour, he observed BC as she continued to consume alcohol.

Around 0100 hours, Ms. Smith and Mr. Saucedo decided it was time to leave. By all accounts, BC was clearly intoxicated, requiring assistance to get to Mr. Saucedo's vehicle. Once at the vehicle, BC became verbally abusive towards Ms. Smith and Mr. Saucedo, saying, "F--- you. I don't need the help. I don't want your help," statements made in apparent response to their plan to drive BC home. BC decided she would leave with appellant. Exiting Mr. Saucedo's vehicle and grabbing her overnight bag, BC, with appellant's assistance, walked to and got in appellant's truck, which was parked approximately thirty to forty yards away. Approximately thirty minutes later, they arrived at BC's residence where, shortly thereafter, they engaged in the sexual activity at issue in The Specification of Charge I.

*B. Ms. Smith's Observations of BC's Intoxication*

Ms. Smith's observations cover the period from when she, Mr. Saucedo, and BC arrived at the club until BC rode away in appellant's truck—about 2200 hours until about 0100 hours.

At trial, Ms. Smith estimated that BC drank anywhere from seven to ten pint-sized mixed drinks in addition to "two ounce" shots. Ms. Smith did not testify to the number of shots BC consumed. When previously interviewed by civilian law enforcement about that night, Ms. Smith indicated BC consumed six drinks. At the court-martial, she explained the numerical discrepancy in drinks by noting that she did not tell the civilian officer about the shots BC consumed. When asked about the amount of alcohol in the drinks, she described the bartenders as "heavy pourers," the result being "more liquor in their drinks than at other bars."

3

Regarding BC's intoxication, Ms. Smith testified: BC became "louder;" had "fallen;" needed help getting up; was "no longer really able to control herself [ ] and her movements;" her words were "very slurred;" and, her eyes "seemed glassy and glazed over." Ms. Smith also noted that BC needed assistance walking to Mr. Saucedo's vehicle as they left the club, however, she could not recall who provided that assistance or how.

Ms. Smith could not recall if BC settled her tab before leaving the club.

Once at Mr. Saucedo's vehicle, Ms. Smith "kind of got into it" with BC, who began "saying things that weren't nice." At that point, BC "decided that she wasn't going home with" Ms. Smith and Mr. Saucedo. After telling Ms. Smith "I don't want to go back with you," BC grabbed her belongings and went to appellant's vehicle. Ms. Smith noted that BC was neither unconscious nor passed out in her presence and when asked if she needed help with her belongings, BC replied in the negative.

Ms. Smith did not observe how BC got from Mr. Saucedo's vehicle to appellant's truck.

*C. Mr. Saucedo's Observations of BC's Intoxication*

Mr. Saucedo's observations cover the same time period as Ms. Smith's.

While in the club, Mr. Saucedo observed BC consume approximately three pint-sized mixed drinks and three or four "two ounce" shots. Consistent with Ms. Smith's testimony, Mr. Saucedo described the drinks as "very strong," "super strong," and, "stronger than normal drinks."

As the evening progressed, Mr. Saucedo noticed "the alcohol started affecting [BC]." At one point, BC "couldn't stand by herself," falling twice, and was slurring her words "a little bit." Following her second fall, Mr. Saucedo "knew that we had to go." In addition to dropping her purse and its contents on the floor, contents that included "a lot of money," BC wore no undergarments beneath her dress and "exposed herself to everybody" in the club. After helping her up and getting her purse and its contents back from the bartenders, who policed-up BC's property from the floor, Mr. Saucedo decided they were leaving. Although he recalls BC requiring assistance to walk to his vehicle, he did not recall "how [they] walked her out" to the vehicle.

Once BC was in the back seat of his vehicle, Mr. Saucedo testified BC became "an irate, drunk girl," someone Mr. Saucedo no longer wanted in his vehicle. After getting out of the vehicle, BC went to appellant's truck although Mr. Saucedo could

not provide details of how BC made it to appellant's truck. At no time, however, did Mr. Saucedo observe BC unconscious or passed out.

Mr. Saucedo observed BC settle her tab before leaving the club.

### D. Appellant's Observations of BC's Intoxication

Appellant's observations of BC's intoxication were consistent with that of Ms. Smith and Mr. Saucedo.

After arriving at the club, some time around midnight, appellant observed BC order five to six shots, which BC consumed in a one-hour period. He described BC as "way too drunk for my personal liking," noting that BC was: "the most drunk I had ever seen her;" "getting worse through the night;" "not her normal self;" and, "stupid drunk." Her speech was slurred; she was stumbling; she fell, exposing herself to others in the club; and when she left the club, she had to "be carried out of the bar by one of her friends."

When describing BC's movement from the club to Mr. Saucedo's vehicle and ultimately to appellant's truck, the appellant was clear that BC required assistance throughout.

During a 15 June 2015 pretextual call from BC, appellant described BC as "already sloshed" when he arrived at the club. He went on to tell BC:

> You couldn't even speak mostly English. And then you had at least six shots before I finally got you out of the bar. I had to - - I had to - - some gay dude carried you out and then you like passed out on the ground. I picked you up and threw you in my truck.

Notwithstanding the above description, appellant also described BC as both "coherent" and not "completely immovable" when approaching and embarking his truck. Appellant described BC as intermittently asleep on the drive from the club to her residence.

Once at her residence, appellant got BC to her front door by picking her up, throwing her over his shoulder, and carrying her, describing her as "dead weight." He went on to explain, "you carry dead weight, you don't drag it." Once at the front door, however, BC was able to stand and unlock her residence by inputting her door's security code, a code that the appellant did not know. Once inside the residence, appellant assisted BC upstairs by having his arm around her back and posterior because she was "stumbling" and having difficulty walking.

*E. Appellant's Description of the 23 May 2015 Sexual Encounter*

According to appellant, BC started kissing him as he prepared to leave her residence after getting her to her room. Appellant claimed the kissing led to the two undressing themselves, each performing oral sex on the other, and eventually engaging in sexual intercourse. The appellant then cleaned himself up in the bathroom, BC dressed and got under the covers of her bed, and appellant left for the evening.

Prior to leaving, however, appellant texted a photograph to Mr. Saucedo of BC asleep in her bed as he promised he would do, showing that BC was home and okay. He also placed a garbage pail next to her bed as she requested.

At the close of the appellant's 18 June 2015 interview with Detective Chancellor, an interview discussed in subparagraph "*G*," below, the appellant said the sex with BC was consensual. He further stated: although she was "intoxicated" "past her normal level of drinking," needed assistance getting where she was going, and, slurred her speech; she was nonetheless awake, removed her own clothing, initiated the sexual encounter by kissing appellant, never passed out, and never expressed any unwillingness to engage in the sexual activity. Appellant ended his interview by noting that BC "was coherent and conscious the entire time during the intercourse."

*F. BC's Limited Version of Events*

For reasons unclear from the record, the government did not call BC to testify, either on the merits or sentencing. That said, the panel was exposed to some information attributable to BC, albeit in the form of hearsay.[3]

On 3 June 2015, BC made a pretextual telephone call to appellant in which she told appellant she was "late"—meaning she might be pregnant—and asked appellant if he used a condom or "pulled out" during their last sexual encounter. Appellant replied, "we always pull out." BC then stated she could not remember the events of 23 May 2015, saying, "I know I got home in the truck but I don't remember much." She asked appellant, "Was I awake when you left or was I passed out?" Appellant responded, "You were awake but were going to bed." She then asked if she opened her door with her code, to which appellant replied in the affirmative.

Twelve days later, on 15 June 2015, BC made another pretextual call. After advising appellant that she was not pregnant, BC asked appellant to fill her in on the

---

[3] Appellant neither objected to this evidence at trial, nor raised this issue on appeal.

events of 23 May 2015, reiterating that she could not remember that evening. In response, the appellant told BC:

> I go in there and you were already sloshed. Like - You couldn't even speak mostly English. And then you had at least six shots before I finally got you out of the bar. I had to - - I had to - - some gay dude carried you out and then you like passed out on the ground. I picked you up and threw you in my truck. Drove you home. And dropped you off. Got you in bed. And I left.

Having confirmed he had to carry her into the house, the appellant ended the call by observing how fortunate it was that BC still "knew [her] code" to the door.

On 1 June 2015, according to Detective Chancellor, Round Rock Police Department, BC reported she was sexually assaulted, tentatively identifying the appellant as her assailant.[4] Detective Chancellor added:

> So the way I structure my investigation, since I take the information initially that is given to me by the victim, and I look at that information as being true on its face until we can determine whether or not that information can be disputed. We have taken several investigative steps through the case. It seemed to corroborate what the victim was telling us and so the next stage in the investigation was to talk to [the appellant].[5]

*G. Detective Chancellor's Interview of Appellant*

On or about 1 June 2015, the Round Rock Police Department received BC's sexual assault complaint. Detective Chancellor was assigned the case. After he ascertained his suspect was likely a solider assigned to Fort Hood, Detective Chancellor requested assistance from the Fort Hood Provost Marshal's Office (PMO) in identifying the suspect. The PMO tentatively identified appellant as Detective

---

[4] While BC's report of sexual assault appears to be hearsay, appellant did not object at trial and has not raised this as an issue on appeal.

[5] While Detective Chancellor's opinion as to the truthfulness of BC's report appears to be impermissible human-lie-detector testimony, and his opinion as to whether BC's report was otherwise corroborated appears to be improper opinion evidence, appellant did not object at trial and has not raised these issues on appeal. Under these circumstances, we find this does not warrant relief as plain error.

Chancellor's suspect. BC later confirmed the identification. Believing appellant would soon be leaving the military, the Round Rock Police Department coordinated with the Fort Hood CID office for assistance in interviewing appellant, specifically requesting a room on post in which to conduct the interview. At the time of this request, there was no active military investigation regarding BC's allegation.

After coordinating with CID, two things occurred: appellant's unit made appellant available for an interview by directing that he report to the CID office, a directive conveyed telephonically by Sergeant (SGT) Addison, a noncommissioned officer in appellant's unit; and, the Fort Hood CID office made a room in their offices available for the interview.

On 18 June 2015, appellant met SGT Addison at the Fort Hood CID office, each traveling to the office separately and in their own vehicles. No one in appellant's chain of command and no person in a position of authority over appellant directed him to do anything other than show up at the CID office. Appellant was neither directed to submit to the interview nor directed to cooperate with law enforcement. Although SGT Addison met appellant at the CID office and waited for him in the waiting area, he believed his duty ended when appellant arrived at the CID office. In short, SGT Addison did not direct appellant to do anything other than meet him at CID.

Once inside the CID office, appellant was interviewed by Detective Chancellor. The interview room was standard—square in shape with a single desk and two chairs. The only law enforcement officer present in the room was Detective Chancellor, who was in civilian attire. His weapon was on his belt and visible at all times. The room had video capability and the interview was both recorded and observed in real-time. Those observing the interview included: Detective Chancellor's supervising Lieutenant from the Round Rock Police Department; the supervisory CID Special Agent; another CID Special Agent; and multiple military prosecutors. None of the observers entered the interview room and, with the exception of several questions suggested at the close of Detective Chancellor's interview, all questions originated with Detective Chancellor.[6]

---

[6] Detective Chancellor testified that his normal interview procedures entail, prior to ending any interview, texting or coordinating with his supervisor or civilian colleague to see if he missed anything or if anything requires clarification. Consistent with that procedure, Detective Chancellor sent his civilian Lieutenant a text that resulted in additional questions being asked, which the Government agreed originated from military prosecutors. During the suppression motions hearing, the Government conceded the additional questions suggested by military prosecutors and the responses thereto should be suppressed. The military judge accepted the

(continued . . .)

Appellant was neither Mirandized nor advised of his Article 31(b), UCMJ rights prior to meeting with or being interviewed by Detective Chancellor.

After being introduced to Detective Chancellor and within the first two minutes of the interview—which lasted just over one hour and twelve minutes—the following colloquy occurred between the appellant (A) and Detective Chancellor (DC):

DC:  I am civilian law enforcement.
A:   Okay.
DC:  Alright.
A:   Okay.
DC:  I am not affiliated with the military.  Haven't been in the military.  I'm not affiliated with the military.  So, I just want to make sure that there's a clear designation there.
A:   Okay.
DC:  Alright.  I made a phone call and had these guys set up an interview room because it seemed like it would be easiest for you and also easiest for me.
A:   Okay.
DC:  Because like I said.  Man - this is a big place.
A:   Yes.
DC:  Alright and I get lost just coming on post.
A:   Okay.
DC:  So.  Um.  My understanding is that you had somebody bring you over - - that you were escorted here.
A:   Yes.
DC:  Okay.  I don't know how that normally works on - - on - -  on the military side.
A:   Okay.
DC:  But this is a voluntary interview and you are free to go at any time.
A:   Okay.
DC:  Alright.

Approximately one minute later, Detective Chancellor advised appellant, again, that he was not obligated to speak with him, stating:  "There are times where

---

(. . . continued)
government's concession and suppressed the follow-up questions and answers.  The evidence contested on appeal is limited to appellant's responses to questions originating solely from Detective Chancellor, prior to any questions from military prosecutors.

folks say, 'You know what, I don't want to talk to you,' and you know what, that's fine. . . . You don't have to."

Near the close of the interview, at the one-hour, three-and-a-half-minute point, the following colloquy occurred:

> A: I want to help with the investigation as much as possible. I - - I - - Again I have no feeling I did anything wrong.
> DC: Right.
> A: And that - - that - So because of that I don't want to hold up your - - your work.
> DC: Right.
> A: But I'm getting to the point where I feel like I should have someone who knows how to word things - - who knows how to word the answers for your questions better than I do.
> DC: And that's completely up to you. You can do that.
> A: So.
> DC: And like I told you before man, you're free to go at any time.
> A: And I know this. And again - - being that - - the fact that I don't feel I did something wrong - -
> DC: Right
> A: - - I don't wanna be like "oh fuck you."
> DC: Yeah.
> A: Cause I wanna help.
> DC: Absolutely.

*H. Appellant's Understanding of Army Law*

Toward the end of the appellant's interview, appellant comes to the realization that "someone's accusing me of nonconsensual sex." While characterizing his decision that night as perhaps not the best decision, the appellant was adamant that he did nothing wrong, noting on several occasions during his interview that BC was a willing participant in the sexual activity the evening of 23 May 2015. When asked to reconcile his comments, the appellant noted, "the Army is always preaching if alcohol is involved just say no and go home." He then added: "[ ] technically you can't give consent if alcohol is involved;" and, "According to the Army and what they preach, any level of alcohol is nonconsensual. That's what I understand."

**LAW AND DISCUSSION**

Appellant contends he was entitled to receive *Miranda* warnings prior to his interview with Detective Chancellor. We specified the issue of whether appellant was entitled to receive a warning under Article 31(b), UCMJ. We conclude appellant was entitled to neither.

## A. *Miranda*

A military judge's ruling on a suppression motion is reviewed for an abuse of discretion. *United States v. Dease*, 71 M.J. 116, 120 (C.A.A.F. 2012). Findings of fact and conclusions of law are reviewed for clear error and de novo, respectively. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). When considering a military judge's ruling on a suppression motion, the court considers the evidence "in the light most favorable to the prevailing party." *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F. 1996).

Appellant argues that his interview by Detective Chancellor triggered his rights under *Miranda*. We disagree.

"No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In *Miranda*, the Supreme Court held, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. The Court further specified that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*.

An individual is only entitled to a *Miranda* rights advisal if the individual is in custody while interrogated. *Id. See also*, *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984) ("a person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda*, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested"); *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009); *United States v. Evans*, 75 M.J. 302, 305 (C.A.A.F. 2016).

Whether someone has been subjected to custodial interrogation depends on whether the individual was questioned by law enforcement after being "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. *See also*, *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004). In evaluating whether an individual was in custody, the courts look to "how a reasonable person in the suspect's situation would perceive his circumstances." *Id*. at 662 (citing *McCarty* 468 U.S. at 434). "The safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to 'a degree associated with formal arrest.'" *McCarty*, 468 U.S. at 440 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). *See also*, *Stansbury v. California*, 511 U.S. 318, 322 (1994) ("In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest

or restraint on freedom of movement' of the degree associated with a formal arrest.'") (quoting *Beheler*, 463 U.S. at 1125) and *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)); *United States v. Schake*, 30 M.J. 314, 318 (C.M.A. 1990). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *McCarty*, 468 U.S. at 442.

Mere appearance at a police station or law enforcement office, without more, does not establish custody. *Chatfield*, 67 M.J. at 438 (citing *Mathiason*, 429 U.S. at 495). Factors to consider in evaluating whether a person has been restrained thus triggering *Miranda* warnings include: "(1) whether the person appeared for questioning voluntarily; (2) the location and atmosphere of the place in which questioning occurred[;] and (3) the length of the questioning." *United States v. Evans*, 75 M.J. 302, 306 (C.A.A.F. 2016) (quoting *Chatfield*, 67 M.J. at 438).

In applying the above factors to the appellant's case, the first factor arguably favors the appellant in that he was directed to show up to the Fort Hood CID office. As noted in the background section, however, that is the extent of the guidance or direction he received from anyone in any position of authority. Once at the CID office, and within two minutes of meeting Detective Chancellor, the appellant was advised that "this is a voluntary interview and you are free to go at any time," advice the appellant acknowledged immediately after receiving it. Approximately one-hour later, appellant was again advised that he was "free to go at any time," to which appellant responded, "And I know this."

Factors two and three favor the government. Although the interview occurred in a Fort Hood CID office, Detective Chancellor advised the appellant that he had nothing to do with the military and that the only reason the interview was occurring in the Fort Hood CID office was as a matter of convenience, convenience to both him and appellant. Appellant's interview lasted just over one hour and twelve minutes, a relatively short interview by all accounts.

The interview atmosphere and the manner in which it was conducted are best described as cordial, non-confrontational, and stress-free—at least beyond the normal stress one would expect in speaking with a law enforcement official.

Nothing in Detective Chancellor's demeanor, body language, tone of voice, or actions conveyed any expectation of cooperation on the part of Detective Chancellor nor was anything said or done that prevented or could be perceived as limiting appellant's freedom of movement, up to and including his freedom to terminate and leave the interview at any time.

A review of the videotaped interview reveals two individuals engaged in a simple conversation. Detective Chancellor never raised his voice, threatened

appellant, or engaged in any conduct that could be characterized as overbearing or coercive in any way.

Considering the totality of the circumstances surrounding appellant's interview, we find that a reasonable person would have believed he was free to leave. In fact, after the first two minutes of the interview, appellant had no reasonable basis to believe his freedom of action was curtailed to any degree. The only reasonable conclusion to reach after the first two minutes of the interview was that appellant was free to get up and leave at any point and he knew it.

Appellant was not in custody, a *Miranda* warning was not required, and the Military Judge did not err by denying appellant's suppression motion on that basis.

### B. Article 31(b)

We next turn to our specified issue, whether the appellant, notwithstanding the non-custodial nature of the interview, was entitled to be advised of his Article 31(b), UMCJ rights. We find he was not.

Article 31(b), UCMJ states:

> No person subject to this chapter may interrogate, or request any statement from an accused or person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Except in limited circumstances, Article 31(b)'s requirement to advise an accused of his rights does not extend to civilian law enforcement personnel. *See generally*, *United States v. Grisham*, 16 C.M.R. 268, 271 (C.M.A. 1954). Civilians need only comply with "the principles of law generally recognized in the trial of criminal cases in the United States district courts involving similar interrogations." *See* Military Rule of Evidence [Mil. R. Evid.] 305(f)(1).

Civilian law enforcement officials are required to advise a suspect under Article 31(b), UCMJ only in two situations: "(1) When the scope and character of the cooperative efforts demonstrate that the two investigations merged into an indivisible entity, and (2) when the civilian investigator acts in furtherance of any military investigation, or in any sense as an instrument of the military." *United States v. Redd*, 67 M.J. 581, 586 (Army Ct. Crim. App. 2008) (quoting *Rodriguez*, 60 M.J. at 251) (internal quotation marks and further citations omitted).

Neither of the two exceptions noted above apply to the case at bar. When appellant was interviewed by Detective Chancellor on 18 June 2015, the only investigation open into the alleged assault was that by the Round Rock Police Department. No military official was actively doing anything to investigate the allegations. The only military activity at that date was assistance in identifying the appellant and the courtesy of providing civilian law enforcement a room on the military installation in which to conduct an interview. All questions at issue and the responses thereto originated with civilian law enforcement and nothing about the interview was the result of any coordinated effort with military officials. Even after the interview, the military played no role in Detective Chancellor's ongoing investigation and when asked by CID if he needed assistance, Detective Chancellor responded in the negative. It was only after the civilian District Attorney declined to prosecute the case that the military assumed an investigative posture toward appellant.

"More than a cooperative relationship between civilian and military authorities is required before civilian authorities will be subject to Article 31(b)." *United States v. Garcia*, 69 M.J. 658, 662 (C.G. Ct. Crim. App. 2010) (citing *United States v. Payne*, 47 M.J. 37, 43 (C.A.A.F. 1997)). *See, e.g., Rodriguez*, 60 M.J. at 251-255 (military surveillance support to civilian federal agents over a five-day period did not transform a civilian investigation into a joint investigation requiring civilian agents to provide Article 31(b) warnings); *United States v. Pinson*, 56 M.J. 489 (C.A.A.F. 2002) (military and civilian investigations were separate and independent notwithstanding military assistance in making a suspect available for a foreign police interview under an international agreement for "each side . . . to cooperate with each").

Assistance in the form of identifying the appellant, making him available for a voluntary interview, and providing an interview room neither merges an ongoing civilian investigation with a military investigation that has not yet begun nor transforms an otherwise independent civilian law enforcement action into action in furtherance of the military. Under these facts, the civilian law enforcement official did not become an instrumentality of the military simply because evidence he gathered independent of the military was later used by the military. Last, the record is devoid of any evidence of subterfuge on the part of military officials or an intent to circumvent the UCMJ or appellant's rights.

The military judge did not err by declining to suppress appellant's statements to Detective Chancellor. Appellant was not entitled to a recitation of *Miranda* or Article 31(b), UCMJ rights prior to his interview with the civilian detective.

Senior Judge WOLFE and Judge SALUSSOLIA concur in Part I.

WOLFE, Senior Judge: (Part II – Factual Sufficiency)

We have reviewed the entire record. We are mindful that the trial court saw and heard the witnesses and we have not. *See United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Considering the totality of the evidence—and especially appellant's admission that he had to carry BC over his shoulder from his truck to her front door—we find appellant's convictions, including his conviction of sexually assaulting BC, legally and factually sufficient. *See id.* We note that appellant describes BC's intoxication differently depending on when she could have been observed by independent witnesses, and when he was alone with her. According to appellant, once they were alone together, BC was transformed from a glassy-eyed woman who could not speak English or walk on her own into a competent, coherent, and sexually aggressive participant in sex. That is, appellant's characterization of BC's intoxication changed markedly when he described situations that were not vulnerable to third-party contradiction. The panel weighed the evidence and convicted appellant. We conclude the panel got it right.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Judge SALUSSOLIA concurs in Part II.

ALDYKIEWICZ, Judge dissenting from Part II:

I respectfully disagree with my colleagues' conclusion that appellant's conviction of sexually assaulting BC is factually sufficient.

Article 66(c), UCMJ, provides that a Court of Criminal Appeals "may affirm only such findings of guilty . . . as it finds correct in law and fact." In performing our duty, we must conduct a de novo review of legal and factual sufficiency. *United States v. Gilchrist*, 61 M.J. 785, 793 (Army. Ct. Crim. App. 2005) (citing *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)). The test for factual sufficiency is "whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *Gilchrist*, 61 M.J. at 793 (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). This review for factual sufficiency "involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399. "[T]o sustain appellant's conviction, we must find that the government has proven all essential elements and, taken together as a whole, the parcels of proof credibly and coherently demonstrate that appellant is guilty beyond a reasonable doubt." *Gilchrist*, 61 M.J.

at 793 (citing *United States v. Roukis*, 60 M.J. 925, 930 (Army Ct. Crim. App. 2005)).

I recognize that a successful sexual assault prosecution involving an incapacitated victim does not necessarily require that the victim testify on the merits. In fact, in many cases, the very nature of the allegation at issue will often result in a victim who is unable to testify to the sexual act itself. Furthermore, nothing herein should be read as a requirement to call the victim in every case. That said, I would find the conviction factually insufficient for the reasons that follow, one of which is the lack of context in which to place BC's alcohol consumption, context BC could have easily provided had she testified. Instead, the panel was left to assume that the "drunkest I had ever seen her" or "stupid drunk," descriptions provided by appellant, equaled incapacitation and an inability to consent to sexual activity.

The government's case consisted entirely of testimony from Ms. Smith, Mr. Saucedo, and statements by appellant in the form of his 18 June 2015 videotaped interview plus 3 June 2015 and 15 June 2015 pre-textual phone call conversations.

Reviewing Ms. Smith's and Mr. Saucedo's testimony objectively does not establish an incapacitated victim. Without a doubt, their testimony establishes an intoxicated individual, but not an incapacitated one. That BC required assistance walking, slurred her speech, fell, had glassy eyes, all observations by Ms. Smith, Mr. Saucedo, or both, establish intoxication but not incapacitation. Mr. Saucedo perhaps summed up BC's condition best, describing her as a "drunk, irate girl." When BC left the club and drove off with appellant, she was: capable of paying her bar tab, which she did; making her wishes known vis-à-vis telling Ms. Smith and Mr. Saucedo that she wanted to leave with the appellant, which she did; expressing her frustration with Ms. Smith and Mr. Saucedo, which she did; and, gathering her belongings from and exiting Mr. Saucedo's vehicle without assistance, which she did. Neither Ms. Smith nor Mr. Saucedo ever observed BC passed out that night or unconscious. Intoxication, even if the worst anyone has ever seen, does not necessarily amount to incapacitation.

This brings us to the appellant's testimony and his videotaped interview. Having reviewed both, I find his version of events consistent with the events as testified to by Ms. Smith and Mr. Saucedo. I also find his testimony credible. The most difficult portion of the appellant's videotaped interview to reconcile with a finding of not guilty is his description of BC as "dead weight" that he had to throw over his shoulders as he carried BC from his truck to her door. His explanation, however, is not inconsistent with having to deal with an intoxicated individual who has fallen asleep on the drive home. The unrebutted evidence established that BC did not remain in this condition once at the door. She, not the appellant, input her

code into the security system and, while assisted up the stairs, she was not carried up stairs.

On 3 June 2015, a mere 11 days after the sexual encounter at issue, the appellant, having no knowledge he was being recorded or that BC had filed a sexual assault allegation against him, was told by BC, "I know I got home in the truck but I don't remember much." He was then asked, "Was I awake when you left or was I passed out." He responded: "You were awake but were going to bed." She then asked, "Did I open the door though with my code?" Appellant responded, "Yes." Appellant made clear that, at least at the end of the sexual encounter, BC was awake—information consistent with his 18 June 2015 videotaped interview as well as his in-court testimony.

Last, the defense offered expert testimony by Dr. Kippenberger, a forensic toxicologist. His testimony was unrebutted by any government expert. He testified about memory formation—or the lack thereof—after the consumption of alcohol as well as alcoholic blackouts. He also testified that persons under the influence of alcohol are capable of making decisions yet not remembering those decisions. Finally, he estimated, based on the limited information available to him, that BC's blood alcohol content was in the .2 to .3 range. His testimony paints a picture of an individual similarly situated to BC, who has consumed a significant amount of alcohol, having the capacity and ability to consent to the sexual encounter at issue yet not remember the encounter. In other words, his unrebutted testimony is consistent with that of appellant, that BC was coherent and a willing participant during the sexual activity with appellant.

Appellant and BC had an unrebutted history of getting together, consuming alcohol, and engaging in consensual sexual activity. The events of 23 May 2015 tracked their relationship. That BC's level of intoxication that night was higher than appellant had previously observed does not, without more, establish BC was incapable of consenting. Perhaps BC could have provided context surrounding her level of intoxication that night and what she did and did not recall, however, for reasons unclear from the record no such evidence was provided.

What we know is that neither Ms. Smith nor Mr. Saucedo could provide context surrounding BC's intoxication that night as compared to the other dozen or so times she drank and had sex with the appellant. We also know BC was not incapacitated when she rode away with the appellant, clearly deciding to leave Ms. Smith and Mr. Saucedo to go home with the appellant. We also know that BC did not consume any additional alcohol after leaving the club. Once at her residence, she entered her security code.

Affirming appellant's conviction requires believing every inculpatory statement made by appellant to Detective Chancellor while disbelieving any part of his

statement that was exculpatory. While I recognize that oftentimes an appellant's statement will contain both inculpatory and exculpatory portions, especially in sexual assault cases—e.g., "yes, we did have sex but it was consensual"—in appellant's case, having reviewed the videotaped interview, the record of trial, and having accounted for not having seen and heard the witnesses, I find the appellant credible when he tells Detective Chancellor that: "I feel like I have done nothing wrong because again this was the normal situation besides the level of intoxication of [BC];" and, "She was coherent and conscious the entire time during the intercourse."

Sex with an impaired individual, regardless of how impaired, does not end the analysis. Article 120(b)(3) "does not proscribe sexual acts with impaired people, but rather with people incapable of consenting to the conduct at issue because of their impairment—and even then, only when the inability to consent is known, or reasonably should be known, to an accused." *United States v. Solis*, 75 M.J. 759, 763 (N-M. Ct. Crim. App. 2016). An individual is incapable of consenting to sexual conduct when he or she lacks "the cognitive ability to appreciate the nature of the conduct in question, [or] the mental and physical ability to make and to communicate a decision regarding that conduct to the other person *United States v. Pease*, 74 M.J. 763, 770 (N-M. Ct. Crim. App. 2015), aff'd 75 M.J. 180 (C.A.A.F. 2016). *See also United States v. Bailey*, 77 M.J. 11, 13 (C.A.A.F. 2017).

"Article 120(b)(3)(A), UCMJ, does not prohibit engaging in sexual acts with a person who is drunk or impaired by alcohol. Put more plainly, mere impairment is no more the standard under Article 120(b)(3)(A), UCMJ, than the SAPR-perpetuated 'one drink and you can't consent' axiom is the standard." *United States v. Newlan*, No. 201400409, 2016 CCA LEXIS 540, *18-19 (N-M. Ct. Crim. App. 13 Sep. 2016).

That BC was impaired is without question. Should she have been driving or operating a vehicle in her condition? Absolutely not. Am I convinced beyond a reasonable doubt that she was incapable of consenting? I am not.

I find the government failed to establish, beyond a reasonable doubt, appellant's guilt to the specification of Charge I and thus would set aside that conviction, dismiss the specification and reassess appellant's sentence.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

18